ACTIESELSKABET NEPTUN v. NEW YORK & BERMUDEZ CO. et al.

ORVIG DAMPSKIBSELSKAB ACTIESELSKABET v. SAME.

(District Court, E. D. New York. March 13, 1916.)

SHIPPING &=>54—CHARTERS—LIABILITY FOR INJURY TO VESSEL.

Two Norwegian steamships, owned by libelants respectively, and under charter, were subchartered by time charters to respondent Hamburg-American Line, which loaded them with coal at Philadelphia after the commencement of the European war, with the purpose of delivering the coal to German cruisers at sea in the vicinity of the Cape Verde Islands. It placed a German supercargo on each vessel, who was expected to direct its movements. The vessels were cleared for Monrovia, Liberia, with Teneriffe, Canary Islands, as a port of call. It was not intended to go to Teneriffe, but the masters, who had full knowledge of the destination of the cargoes before leaving port, took the vessels there and cabled to the owners, who then assumed direction and refused to permit the vessels to leave that port. After some three months of negotiations between all parties, respondent sold the cargoes there, had them discharged, and paid the charter hire to that time. Before the discharge, however, the coal in each vessel had taken fire, and suits were brought by libelants against the Hamburg-American Line for resulting damage to the vessels. *Held*, that whether or not the dispatch of the vessels was in violation of the law of neutrality was immaterial, since, if so, the fact had no causal connection with the fires, the vessels having been withdrawn from such voyages long before they occurred by the action of the masters and libelants, and that respondent was not responsible for the long detention of the cargoes on board after libelants had assumed charge of the vessels, conceding, as claimed but not proved, that such detention was the cause of the fires.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 219–221; Dec. Dig. &=>54.]

In Admiralty. Suits by Actieselskabet Neptun against the New York & Bermudez Company and Hamburg Amerikanische-Packet-fahrt-Actien-Gesellschaft and the Orvig Dampskibselskab Actieselskabet against the same. Decrees for respondents.

See, also, 229 Fed. 293.

Ralph James M. Bullowa, of New York City (Ralph James M. Bullowa and Max Lowenthal, both of New York City, of counsel), for libelants.

Burlingham, Montgomery & Beecher, of New York City (Chas. C. Burlingham and Roscoe H. Hupper, both of New York City, of counsel), for New York & Bermudez Co.

Haight, Sandford & Smith, of New York City (Howard S. Gans and Edward Sandford, both of New York City, of counsel), for Hamburg-American Line.

VEEDER, District Judge. In these two libels the owners of the steamships John. Ludg. Mowinckel and Nepos seek to recover from the respondents compensation for damages resulting to the vessels from fire in the coal cargo about three months after their arrival at Teneriffe.

In brief, the allegations of the libels are that the respondents, who were, respectively, charterers and subcharterers of the two vessels,

conspired, without the knowledge or consent of the libelants, to sublet the steamers for the purpose of carrying coal and provisions to belligerent cruisers of the German Empire, in violation of the acts of Congress and provisions of law of the United States, of the requirements for the preservation of neutrality imposed upon the United States by international law, and in violation of the laws and regulations of the Storthing of the kingdom of Norway; that pursuant to such conspiracy the vessels were falsely cleared for Monrovia, Liberia, the real object being to meet and supply a German cruiser at the Cape Verde Islands; that pursuant to the orders of the conspirators these steamships sailed from Philadelphia in August, 1914; that thereafter the masters withdrew said steamships from the service of the respondents and proceeded to Las Palmas, in the Canary Islands, where they arrived in September; that thereafter, failing to induce the masters to sail from Las Palmas pursuant to the conspiracy, they held the cargo on said vessels for an unreasonable period of time, so that the coal caught fire and damaged the ships. The libels also allege that the Hamburg-American Line expressly promised to pay the damages caused by fire.

I think that a comprehensive and orderly statement of the material facts disclosed by the evidence will indicate very clearly the true solution of the issues involved. The Mowinckel and Nepos were Norwegian steamships owned by the Orvig Dampskibselskab Actieselskabet and the Actieselskabet Neptun, respectively, and had been chartered by the owners to John. Ludg. Mowinckel, who had in turn chartered them for a term of about five years to the New York & Bermudez Company in October, 1913. On August 17, 1914, the Nepos, and on August 24, 1914, the Mowinckel, were chartered by the New York & Bermudez Company to the Hamburg Amerikanische-Packetfahrt-Actien-Gesellschaft, otherwise known as the Hamburg-American Line, under a time charter for not less than three calendar months and not exceeding six calendar months at charterer's option. It was the purpose of the Hamburg-American Line to use the vessels in supplying German warships on the high seas. Accordingly the vessels were directed to proceed from Perth Amboy to Philadelphia, where they took on cargoes consisting principally of coal. The execution of the charterer's purpose was intrusted to a German supercargo on each vessel. The plan, as developed in Philadelphia, was that the vessels should clear for Monrovia, Liberia, with Teneriffe, in the Canary Islands, as a port of call. Accordingly the manifests gave Monrovia as the destination of the cargo, which was consigned by W. J. Grandfield, of Philadelphia, to order. It was not really designed, however, to call at Teneriffe, but once at sea to proceed to the Cape Verde Islands and there cruise about on a prescribed course for 48 hours, when it was expected that German warships would appear and take off the cargoes. The evidence leaves no doubt that the masters of these vessels were aware before sailing of the real destination of the cargoes, although it does not appear that the details of the transaction were fully disclosed at that time. Both captains had been notified by the New York & Bermudez Company's agent that instructions

had been given to allow them liberal gratuities for attending to the subcharterer's interests, and it was apparently expected that the supercargoes would be able to accomplish the desired result.

Before the Nepos sailed from Philadelphia on August 22, 1914, the real destination of the cargo was known not only to Capt. Nielsen and the mate, but had filtered down even to the cook. The officers refused to go; some of them went to see the Norwegian consul. Eventually they were brought to terms by the supercargo, Flohr. Flohr then promised Capt. Nielsen $1,000 to go to a point off the Cape Verde Islands and deliver the cargo to German warships. Nielsen refused, whereupon Flohr said they would clear for Monrovia. Nielsen knew that the course for Monrovia ran through the Cape Verde Islands, and he agreed to go only on condition that they call at Teneriffe. Meanwhile he cabled the owner on August 22d: "Left to-day Teneriffe for orders. Coal and general cargo. Expect your instructions on arrival." Once at sea Capt. Nielsen made straight for Teneriffe. Flohr said nothing further to him about going to the Cape Verde Islands, knowing, as the captain puts it, that "there was no use asking it." The Nepos arrived at Teneriffe on September 7th.

In the case of the Mowinckel, Capt. Frich testified that the supercargo, Maurer, spoke to him at Philadelphia about supplying German warships, and promised him "a good lot of money." He received $200 there. Frich consulted with the Norwegian consul, by whom he was advised to proceed to one of the ports named in his papers. The Mowinckel sailed on September 1st. Upon passing Delaware Breakwater Maurer gave Capt. Frich written directions as follows: "By orders received at the Delaware Breakwater you are advised to steer direct to Monrovia (Rep. Liberia) and omit Teneriffe (Canary Islands)." Although no such message could have been received at that place, since the ship had no wireless equipment, Capt. Frich put his course for Monrovia, which strikes about the Cape Verde Islands. He was then told by Maurer that the place where it was expected that the German warships would be met was a line between Rombos and Sao. Vicente, two of the Cape Verde Islands. At 4 o'clock on the morning of September 20th the Mowinckel arrived at what the supercargo was led to believe was the appointed meeting line, but which was in fact a point 15 or 20 miles west of that line, and there the Mowinckel steamed up and down for 18 hours. Capt. Frich testified that he at no time had any intention of going to the meeting line, nor of delivering the cargo to German warships. At 10 o'clock on the night of September 21st he extinguished his lights and made at full speed for Teneriffe, where he arrived on the 26th.

Capt. Frich immediately wired his arrival to his owners in Norway and to the New York & Bermudez Company's agent, Wrigley, in New York, and sent a letter to his owners in which he "explained everything." He says he received orders from his owners to stay there. When the Nepos arrived at Teneriffe Capt. Nielsen found no orders awaiting him. At the end of September his owners cabled him to inquire whether the Nepos had sailed. He answered, "Still waiting orders." In October the owners cabled him not to leave without their

consent. On September 27th his supercargo wired the Hamburg-American Line's director in New York, Buenz: "Captain run here. Whole cargo on board. Will only with consent of owners follow orders from charterers. I protest in vain." Buenz replied on September 28th, "Wait for orders." Meanwhile the original charterer, Johann Ludwig Mowinckel, who was in New York, was apparently in touch with the situation. As early as August 25th Wrigley wrote the Hamburg-American Line that he had received the following cable (evidently from the owners): "Nepos sailed Teneriffe. Ascertain destination. Charterers must pay war risk. Telegraph Ludwig Mowinckel." To this Wrigley reported that he had replied that the steamer had sailed for Monrovia, and that there was no reason why any one should pay war risks between neutral countries. Counsel for the New York & Bermudez Company wrote Mowinckel, at the Hotel Plaza, on September 29th, that there was no possibility of the Mowinckel or Nepos leaving port, and that their cargoes would probably be ordered discharged. Koetter, superintending engineer of the Hamburg-American Line, also wrote Wrigley on September 30th they would communicate with him as soon as they reached a decision with reference to the Mowinckel. On October 1st counsel for the New York & Bermudez Company renewed his assurance to Mowinckel that there would be no trouble, and reported that he had been informed that orders had already been given to discharge the cargo of the Mowinckel. On the following day he again wrote to Mowinckel: "Our friends wish you to cable to the masters of the Johann Mowinckel and the Nepos not to leave port without orders from you." On October 2d Koetter cabled Maurer: "Have made arrangements selling cargo Mowinckel. Must remain there until you receive further orders." Meanwhile Grandfield & Co., the shippers, had cabled to Dekade, the German coal depot, and Hamilton & Co., at Teneriffe, on September 29th, September 30th, and October 2d, respectively: "Make best offer cargo laden Mowinckel. Reply." Hamilton & Co. replied on October 7th: "No offers." Thereupon, on October 9th, "Buenz Koetter" cabled Maurer: "Sell cargo best obtainable price. Inform Robert Flohr, Nepos, to do the same. Confirm receipt." On October 17th the Hamburg-American Line wrote to Johann Ludwig Mowinckel and the New York & Bermudez Company:

"As subcharterers of the steamers Johann Ludwig Mowinckel and Nepos, we request you to direct the masters of these steamers without production of bills of lading, to discharge all cargo thereon at Teneriffe as and when ordered to do so by the respective supercargoes on said steamers, and we guarantee to protect and save harmless you and the owners from any consequences arising from such delivery and from any claims which may be made thereafter under such bills of lading."

Mowinckel replied through counsel on the 19th that he was "prepared to cable to his home office in Bergen a request to instruct the masters of the two steamers in the sense requested," and on the following day the New York & Bermudez Company acquiesced in the procedure suggested. On October 25th Capt. Nielsen received directions from his owners: "Deliver cargo Teneriffe. Satisfactory guaranty given here." In November Dusterdieck, traveling inspector for

the Hamburg-American Line, appeared at Teneriffe, stating that he had come over from America to sell the cargo. He told Capt. Nielsen that he had the bills of lading and would dispose of the cargo soon; but the supercargo, Flohr, disputed his authority to do so. Subsequently Dusterdieck told Capt. Frich that the German or Austrian consul at Las Palmas had taken the papers from him, so he could not sell the cargo. On November 23d Capt. Nielsen received a cable from his owners: "Cargo must not be disposed of in any way violating our neutrality." He answered on the following day: "Certainly not. Trust me. Will write." On November 28th he wired the owners: "Arrangements for discharge stranded. Propose that you take steps."

This brings the narrative down to the breaking out of fire in the cargoes. But before taking up that event, the relations meanwhile between the parties, particularly between the masters of these vessels and the supercargoes, require notice. Capt. Nielsen, of the Nepos, testified that the supercargo, Flohr, "asked him once if he wanted to go out and go to the Western Islands and hang off there." He replied that he did not. He testified in his first deposition that Flohr told him that he was going to get orders to go down somewhere around the Cape Verde Islands, and told him to keep up steam and have everything ready for the orders. But no orders came. At the hearing he said the reference to the Cape Verde Islands was incorrect; it should read the Western Islands, which he identified only as "north in the Atlantic." When his statement about the Western Islands was read to him from his deposition, he did not remember that he said it that way; "I can't remember because he never ordered me to go." The only reference made by Capt. Frich, of the Mowinckel, to this subject, is his statement that, "They asked me if I would go out, provided I got a bank guaranty for the value of the ship," to which question he says he answered, no. Both masters received funds, amounting to several thousand pesetas, from the supercargoes at Teneriffe for the ship's use, and all parties had notice of such payments. On November 18th Wrigley notified the New York & Bermudez Company of the receipt of $13,750 for hire of the Nepos for the month November 18th to December 18th.

On December 7th light smoke was discovered in No. 2 hold of the Mowinckel. Capt. Frich at once began pumping water in. When fire was first discovered he told his supercargo to get the cargo sold and discharged. On the 18th he informed the supercargo that if discharging was not begun immediately, he "would take people from shore and chuck the coal overboard." He then found out, he says, that the cargo had already been sold to the German Coal Depot. All formalities with the authorities having been settled, the discharging of the coal cargo began on December 20th and was completed January 28th. Meanwhile on January 8th, he had received from his owners this cable: "Inform charterers we consider them responsible full damage ship and time repair. Try get charterer's declaration that they will pay full, otherwise demand average bond cargo including our reservation full compensation damage tyne."

He had already received notice from the German Coal Depot that it was willing to partake in a general average, and cabled the owners:

"Have received average bond consignee and the money received for ships use pesetas 12,150 as guarantee from charterers is insurance satisfied that." The owners answered on January 15th: "If you consider guarantee sufficient I agree." On January 25th Maurer wrote Capt. Frich: "I beg to inform you that all damages and consequences caused by the fire and water in your ship will be paid by charterers."

In the case of the Nepos, Capt. Nielsen says he never thought of fire until it broke out in the Mowinckel's cargo on December 7th. Then he took the temperature and found that the heat was increasing. Fire was not discovered until December 30th. On cross-examination Capt. Nielsen added that, although he had prior to December 7th no fear of fire breaking out, "of course I had reason to expect it. We had already been there then over three months; the cargo had been in four months." "The cargo had been too long in the ship, that is all; it was overheated." When the other cargo caught fire he asked the supercargo if there was not any way of getting rid of the cargo. The supercargo said he would not discharge the cargo; there was no danger, and he wanted to keep the cargo in the ship by all means. When fire was discovered on December 30th he went ashore and told the supercargo that he would have to discharge the cargo then whether he wanted to or not. Flohr notified him, apparently on the same day, that the German Coal Depot had bought the coal, and promised that they would start discharging on the following day; but nothing was done. Thereupon, on the following day, he wrote Flohr:

"As you were mutually informed yesterday the cargo of coal in S/S Nepos is on fire and discharging must be effected immediately. If this is not carried out right away I must take steps myself to get the dangerous cargo out of the ship. Trusting that you will attend to this as it is absolutely necessary to save ship and cargo, Yours truly."

On January 3d he wrote to the German Coal Depot:

"I have been informed that you have bought the cargo of coal in the S/S Nepos. As you well know the coal cargo is on fire, and must be discharged as quick as possible for the safety of the ship as for the cargo itself. As there is sure to be some damage to ship from steam and water we had to pour down, and more so now I fear damage to ship's bottom from fire, I must according to international law demand from you a guaranty for your partaking in general average, that is to sign general average bond. I also want to point out to you that the damage is sure to increase and I will advise you to hurry up discharging to avoid further damage. Attached please find a copy of survey report held on board on the 31st Dec. last."

To this he received a reply that they were willing to partake in the general average.

It does not appear when discharging was begun, but the cargo was discharged on January 27th. On January 29th he and Flohr signed this agreement:

"Up to date received from R. Flohr, supercargo of S/S Nepos total sum of pesetas, seventeen thousand, say seventeen thousand pesetas. It is understood that this amount is to be 'a general average bond' as a guaranty from assignees of cargo at present on fire in S/S Nepos until final settlement."

This was the total of various sums received up to that time, and nothing was received thereafter. No general average statement was ever made up.

Both cargoes were discharged in surf boats belonging to German liners lying in the harbor. It appears that the German·Coal Depot had no sufficient place to ·receive all of it, and sold part of it to Hamilton & Co., an English firm.

It may be added that on February 2d Wrigley wrote to Helliesen, Mowinckel's New York broker, that the subcharters of these two boats to the Hamburg-American Line had that day been canceled by agreement—

"and we have accepted redelivery of the steamers from the Hamburg-American Line at Teneriffe. We are cabling the captains advising them of the cancellation of the charters to the Hamburg-American Line and directing them to proceed immediately in ballast to Cape Henry for orders. We request that you communicate these orders to Mr. Mowinckel in order that there may be no delay in the carrying out of our instructions to the captains."

On the same day Koetter cabled Maurer of this cancellation and redelivery, and instructed him to notify the masters that they must follow the orders of the Bermudez Company. Flohr notified Capt. Nielsen on the 5th. On the 3d Wrigley cabled ·the masters: "Hamburg-American charter canceled by agreement. Proceed immediately under New York Bermudez charter in ballast to Cape Henry." ·But they did not sail until they had received orders from their owners February 9th; and when they arrived at Cape Henry they reported to the owners' agent there. It appears that the British government had been fully informed of the case, and, after commending the course pursued by the masters, had given instructions to its cruisers to permit the steamers to proceed without molestation.

It appears from the foregoing statement that it is unnecessary to decide whether the dispatch of these vessels from Philadelphia was a violation of the laws of the United States or of the law of nations, for, if it were, it would have no bearing upon the recovery sought in this case. What I take to have been the original plan of the Hamburg-American Line to clear the vessels for the Cape Verde Islands was evidently frustrated by the refusal of the masters, or at all events of Capt. Nielsen, to sail unless permitted to call at Teneriffe for orders. When that course was agreed upon the Nepos proceeded directly to Teneriffe without going anywhere near the appointed ·meeting line. In the case of the Mowinckel, it appears that Capt. Frich, notwithstanding his protestation that he at no time intended to comply with the supercargo's directions, must have been undecided, if not complaisant, in changing his course from Teneriffe to the Cape Verde Islands in compliance with the perfectly transparent artifice employed by the supercargo at Delaware Breakwater. But whatever his state of mind may have been, he did not actually cruise upon the appointed meeting line. Ultimately he made for Teneriffe and arrived there without meeting any German warships.

The voyage to Teneriffe was perfectly legal, whatever the respondent's intentions. Both masters knew before leaving Philadelphia that the cargoes were not destined for Teneriffe, but, instead of cabling their owners then, they chose to go to Teneriffe to get their owner's orders there. The libels expressly allege that the masters thereafter withdrew the steamships from the service of the respondents. As

soon as the vessels arrived at Teneriffe the owners were fully informed of their masters' acts. They simply instructed the masters to remain there until further orders from them. Thereafter both masters made it plain, both by word and act, that they would take no orders from either of the respondents; and they did not. The owners had resumed possession of their vessels, with the subcharterer's cargo aboard.

In this situation negotiations began among all the parties concerned. Cables flew thick and fast. It is quite apparent many of them are not in evidence. But it is plain that the parties were dealing with one another on equal terms, and that each was playing for his own advantage. Indeed, if there was any disparity among the parties, it was in the case of the Hamburg-American Line with its cargo blocked in Teneriffe by English cruisers. Eventually an agreement was reached which involved a readjustment of relations. The vessels were restored by the owners to the New York & Bermudez Company at the expiration of the period for which they had been chartered to the Hamburg-American Line, and the New York & Bermudez Company received from the latter the hire in full.

Meanwhile, however, fire had broken out in both cargoes and damaged the vessels. No direct causal connection between that event and the voyage from Philadelphia is alleged in the libels. The allegation is that: "Failing to induce the masters to sail from Las Palmas pursuant to the conspiracy, they held the cargo on said vessel for an unreasonable period of time, so that the coal caught fire and caused the steamship to sustain damage." It may be assumed the Hamburg-American Line would have been glad to get its cargoes out of Teneriffe. But it was hopeless to expect that, for British cruisers were lying off the port all the time. This was recognized by the respondent. The testimony of the supercargoes is that they were ordered not to venture out, but to stay there. They merely broached the subject to the masters, and were met with prompt refusal to consider it. If this can be construed as an attempt to induce the masters to go out, then, as the libel alleges, it failed.

Did the respondents or their agents "hold the cargo on the said vessels for an unreasonable period of time, so that the coal caught fire and caused the steamship to sustain damage?" In the first place, the cargoes were not and could not be held on board the vessels which had been withdrawn from the service of the charterers, and over which the owners had resumed possession and direct control. Then the allegation concerning "detention for an unreasonable period of time so that the coal caught fire" presupposes a necessary connection between a certain period of time and combustion of a coal cargo. If there were any such certain period, surely the owners were equally chargeable with notice of it. But there is no proof of it. The evidence shows that neither master thought of fire until it appeared in the Mowinckel's cargo on December 7th. Capt. Nielsen, it is true, sought to modify his admission by adding that nevertheless he had reason to expect it because the cargo had been too long in the ship. If he had reason to expect it and gave no thought to it, then it was

his fault. As a matter of fact the cargo had been on the Mowinckel a little over three months, and on the Nepos a little over four months, when fire was discovered. In the absence of proof it seems to be assumed that the fire arose from spontaneous combustion. But the only evidence in this case concerning spontaneous combustion is the testimony the Hamburg-American Line's superintending engineer gave that spontaneous combustion may occur in time if there is not sufficient ventilation. Both masters assert that these cargoes were properly ventilated. There is no intimation by anybody to the contrary.

The remaining claim of liability is based upon the fact that in the case of the Mowinckel the supercargo, Maurer, wrote Capt. Frich on January 25th that all damages and consequences caused by the fire and water in his ship would be paid by charterer. Presumably Maurer thereby undertook to speak for the last charterer, the Hamburg-American Line. But there is no proof of his authority to bind that respondent, and such authority may not be implied from the position which he occupied after arrival at Teneriffe. Moreover, at the date of this communication, January 25th, the coal on fire had evidently been discharged. Discharging had been going on since December 20th, and the coal was completely discharged on January 28th. There is no proof that there was any fire in or damage from the coal discharged during the last three days.

The libels are dismissed.